1
2
3
4
5
6
7

8                         UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANDRE RAMON CRAVER,                        No.  2:20-cv-2327 WBS DB P

12                 Plaintiff,

13         v.                                    FINDINGS AND RECOMMENDATIONS

14   C. FLOYD,

15                 Defendant.

16

17         Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42

18   U.S.C. § 1983.  Plaintiff claims defendant was deliberately indifferent to his medical needs

19   when she refused to recommend that he receive double portions of food while he received

20   chemotherapy.  Presently before the court is defendant's fully briefed motion for summary

21   judgment.  (ECF No. 39.)  For the reasons set forth below, the undersigned will recommend

22   that the motion for summary judgment be granted.

23   ////

24   ////

25   ////

26   ////

27   ////

28   ////

                                                1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

I.      **Relevant Procedural History**

Plaintiff initiated this action on November 11, 2020.[1]  (ECF No. 1.)  His complaint names C. Floyd, and alleges a single Eighth Amendment claim for failure to provide him with adequate food.  (Id.)  Upon screening, the court found that plaintiff's complaint stated a cognizable Eighth Amendment claim.  (ECF No. 5.)  Defendant served an answer on December 3, 2021.  (ECF No. 20.)

After discovery, defendant moved for summary judgment on January 30, 2023.  (ECF No. 39.)  Plaintiff opposed, and defendant replied on April 7, 2023.  (ECF Nos. 44, 47.)

II.     **Allegations in the Complaint**

Plaintiff states that at all relevant times he was an inmate at Mule Creek State Prison ("MCSP"). (ECF No. 1 at 5.)  Plaintiff names C. Floyd, a dietitian at MCSP, as the sole defendant. (ECF No. 1 at 1, 5.)[2]

Plaintiff alleges that, during his incarceration at MCSP, he was diagnosed with multiple myeloma cancer.  (Id. at 5.)  He was subsequently admitted to MCSP's Correctional Treatment Center ("CTC"), and medical staff determined that he required between 2,000 and 2,600 calories per day.  (Id.)

Plaintiff began chemotherapy on March 30, 2020.  (Id.)  As part of his treatment, he was administered dexamethasone, which can cause an increased sense of appetite.  (Id.)  He subsequently developed taste aversions to certain foods, which caused him to regurgitate them. (Id.)  These food items included peanut butter sandwiches, celery, peanut butter crackers, and "pancake breakfast meals with the cured slice turkey."  (Id.)  Plaintiff told defendant about these aversions, but she allegedly told him, "Eat it anyway, you need the strength."  (Id.)  Plaintiff also told her that he felt "extremely hungry after breakfast, lunch, and dinner everyday," that he was

---

[1] Under the prison mailbox rule, a document is deemed served or filed on the date a prisoner signs the document and gives it to prison officials for mailing.  See Houston v. Lack, 487 U.S. 266, 276 (1988) (establishing the prison mailbox rule); Campbell v. Henry, 614 F.3d 105, 1059 (9th Cir. 2010) (applying the mailbox rule to both state and federal filings by incarcerated inmates).

[2] C. Floyd is referred to as "her" in various pleadings, including the plaintiff's disputed facts. (ECF 39-1.)

2

experiencing headaches and substantial hunger pains, and that he had lost thirty-nine pounds.  (Id. at 5–6.)  Defendant denied his request for extra food portions.  (Id. at 6.)

Plaintiff continued to experience these symptoms throughout May 2020, and continued to report them to defendant.  (Id.)  Nonetheless, defendant allegedly told plaintiff to continue eating the food items in question and offered him a supplement, Boost.  (Id.)  Plaintiff developed an aversion to the Boost as well and reported it to defendant, but she continued to offer plaintiff Boost.  (Id.)

In late May 2020, plaintiff filed a medical grievance alleging that he was receiving an "inadequate medical diet."  (Id.)  During the subsequent interview, which defendant conducted, plaintiff again informed defendant that he was "in substantial pain from the hunger" and "experiencing chronic headaches from the hunger pains."  (Id. at 7.)  He requested "an adequate medical diet to fit his needs."  (Id.)  Defendant again denied his request for extra food.  (Id.)

Defendant told plaintiff that his meal plan provided him with 2,400 calories per day, and that she accounted for his cancer diagnosis when determining his dietary needs.  (Id.)  In June 2020, plaintiff began to save the nutrition labels from some of the food items in his meal plan.  (Id.)  According to his calculations, he was not receiving 2,400 calories per day.  (Id.)  On July 21, 2020, he submitted an inmate request for interview form to defendant, in which he asked her to verify the number of calories he was supposed to be receiving per day, and for the "calorie count" of specific food items that came with his meals.  (Id. at 8.)  He also told her that he did not believe he was receiving 2,400 calories per day from his meal plan, and gave her the nutrition labels he had been saving.  (Id.)  According to plaintiff, defendant "was shocked" and "knew that [plaintiff] was not receiving [an] adequate medical diet."  (Id.)  Defendant again offered him Boost, and plaintiff again informed her that he could not tolerate Boost.  (Id. at 9.)  Defendant denied his request for extra food portions.  (Id.)

Plaintiff submitted another inmate request for interview form to defendant on July 29, 2020, asking that she substitute milk products in his meal plan because he was lactose intolerant, as well as the items to which he had developed an aversion.  (Id. at 10.)  Defendant replied, "We do not make substitutions for meals in CTC."  (Id.)

1    On September 15, 2020, plaintiff told defendant he was still "starving" and again asked

2    for increased portions.  (Id. at 14.)  Defendant allegedly told him that his weight "looked good"

3    and denied his request.  (Id.)

4    Plaintiff accuses defendant of violating his Eighth Amendment rights by denying him

5    adequate food.  (Id. at 12.)  He believes that she knew of his serious medical need for more

6    calories, based on his communications with her and his decline in weight, but that she deliberately

7    ignored this risk to plaintiff by refusing to recommend additional portions and to substitute the

8    items he could not eat.  (Id. at 12–13.)

9    **MOTION FOR SUMMARY JUDGMENT**

10    **I.    Summary Judgment Standards**

11    Summary judgment is appropriate when the moving party "shows that there is no

12    genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

13    law." Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party bears the

14    burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec.

15    Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323

16    (1986)).  The moving party may accomplish this by "citing to particular parts of materials in

17    the record, including depositions, documents, electronically stored information, affidavits or

18    declarations, stipulations (including those made for purposes of the motion only), admissions,

19    interrogatory answers, or other materials" or by showing that such materials "do not establish

20    the absence or presence of a genuine dispute, or that an adverse party cannot produce

21    admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

22    "Where the non-moving party bears the burden of proof at trial, the moving party need

23    only prove there is an absence of evidence to support the non-moving party's case." Oracle

24    Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

25    Indeed, summary judgment should be entered "after adequate time for discovery and upon

26    motion, against a party who fails to make a showing sufficient to establish the existence of an

27    element essential to that party's case, and on which that party will bear the burden of proof at

28    trial." Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential

1    element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at

2    323.  In such a circumstance, summary judgment should "be granted so long as whatever is

3    before the district court demonstrates that the standard for the entry of summary judgment, as

4    set forth in Rule 56(c), is satisfied." Id.

5          If the moving party meets its initial responsibility, the burden shifts to the opposing

6    party to establish that a genuine issue as to any material fact actually does exist. Matsushita

7    Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In attempting to

8    establish the existence of this factual dispute, the opposing party may not rely upon the

9    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

10   form of affidavits, and/or admissible discovery material, in support of its contention that the

11   dispute exists. See Fed. R. Civ. P. 56(c).  The opposing party must demonstrate that the fact

12   in contention is material, i.e., a fact "that might affect the outcome of the suit under the

13   governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

14   Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

15   genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the

16   nonmoving party," Anderson, 477 U.S. at 248.

17         "In evaluating the evidence to determine whether there is a genuine issue of fact, [the

18   court] draw[s] all inferences supported by the evidence in favor of the non-moving party."

19   Walls v. Cent. Costa Cnty. Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (per curiam)

20   (citation omitted).  It is the opposing party's obligation to produce a factual predicate from

21   which the inference may be drawn. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902

22   (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more

23   than simply show that there is some metaphysical doubt as to the material facts." Matsushita

24   Elec. Indus. Co., 475 U.S. at 586 (citations omitted).  "Where the record is taken as a whole

25   could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

26   issue for trial.'" Id. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Servs. Co., 391 U.S.

27   253, 289 (1986)).

28   ////

On a motion for summary judgment, it is inappropriate for the court to weigh evidence or resolve competing inferences.  "In ruling on a motion for summary judgment, the court must leave '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts' to the jury."  Foster v. Metropolitan Life Ins. Co., 243 F. App'x 208, 210 (9th Cir. 2007) (quoting Anderson, 477 U.S. at 255).

## II.     Undisputed Material Facts

Defendant filed a Statement of Undisputed Facts ("DSUF") as required by Local Rule 260(a) along with her motion for summary judgment.  (ECF No. 32-2.)  Plaintiff's filing in opposition to defendant's motion for summary judgment complies with Rule 260(b), which requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial."  (See ECF No. 44 at 10–14.)

The court is mindful of the Ninth Circuit's instruction that district courts are to "construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly."  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  Accordingly, the court considers the record before it in its entirety.  However, only those assertions in the opposition that have evidentiary support in the record will be considered.

### A.  MCSP's Dietary Policy

Pursuant to MCSP policy, MCSP provides inmate-patients with meals based on a standardized master menu consistent with a "heart healthy" diet.  The Heart Healthy or "regular" diet at the CTC is restricted in sodium and fat, while supplying adequate calories, fiber, and all essential nutrients. This regular diet consists of approximately 2,400 daily calories.  (DSUF (ECF No. 39-2) at ¶ 8.)

////

////

An inmate patient who experiences a weight loss of greater than five percent of his body weight during the prior six months may be referred by his primary care physician to a dietitian for diet consultation and instruction.  (DSUF (ECF No. 39-2) at ¶ 10.)

For those inmate-patients exhibiting moderate to severe protein or calorie malnutrition due to metabolic deficiency or metabolic response to injury or illness, evidenced by significant weight loss of five percent or more of the inmate-patient's body weight over the prior six months, a primary care physician may prescribe a Liquid Nutritional Supplement (LNS) after consulting with the inmate-patient's dietitian.  (DSUF (ECF No. 39-2) at ¶ 11.)

MCSP CTC offers a variety of "Boost" to those inmate-patients with a prescription for LNS, including Boost Original (regular) and Boost Breeze (clear).  Boost Original and Boost Breeze each come in an eight-fluid-ounce container and contain about 250 calories.  According to defendant, Boost Breeze tastes like juice and is suitable for individuals with lactose intolerance.  (DSUF (ECF No. 39-2) at ¶ 12.)

If, and only if, an inmate-patient is not able to tolerate the LNS and weight loss continues, there are rare instances in which more food may be needed, with the approval of the primary care physician.  (DSUF (ECF No. 39-2) at ¶ 13; ECF No. 39-4 at 5.)

An inmate-patient who requests a special diet due to a claimed food intolerance or allergy will be evaluated by his primary care physician or a designee.  If the primary care physician determines that the patient is allergic or intolerant to a readily identified food item, such as lactose intolerance or peanuts, the primary care physician, with assistance from the dietitian and food administrator, will educate the inmate-patient to avoid the offending food.  However, no food substitution will be given.  (DSUF (ECF No. 39-2) at ¶ 14; ECF No. 39-4 at 5–6.)

MCSP policy identifies three examples of "extreme cases" in which an inmate-patient does not tolerate a LNS: (1) multiple food-allergy related hospitalizations; (2) an abnormal food allergy lab profile; and (3) verified food-specific allergen signs and symptoms, including, but not limited to, anaphylaxis, eosinophilic esophagitis, hives, and enterocolitis.  (ECF No. 39-4 at 5.)

**B.  Plaintiff's Cancer Diagnosis and Treatment**

Plaintiff was diagnosed with multiple myeloma in January 2020.  (DSUF (ECF No. 39-2) at ¶ 17.)

Plaintiff was admitted to CTC for cancer treatment on March 17, 2020.  Upon admission, plaintiff weighed 199 pounds, and had lost approximately 7.2 percent of his body weight in the previous six months.  (DSUF (ECF No. 39-2) at ¶¶ 17–18; ECF No. 39-4 at 20.)

On or about March 17, 2020, plaintiff was placed on the Heart Healthy Diet and was referred to a registered dietitian, defendant Floyd, for a consultation regarding his weight loss.  (DSUF (ECF No. 39-2) at ¶ 20.)

Plaintiff met with defendant Floyd on March 19, 2020 for his initial consultation.  At the consultation, plaintiff told defendant that he had been eating 100 percent of his food but felt like he was "starving."  He also told defendant that he was lactose intolerant.  Because plaintiff had lost over five percent of his body weight in the last six months and informed defendant that he was lactose intolerant, defendant recommended he take one LNS of Boost Breeze per day.  Defendant notified plaintiff's primary care physician about her recommendation regarding Boost Breeze.  (DSUF (ECF No. 39-2) at ¶ 22; ECF No. 39-4 at 20.)

On March 26, 2020, defendant met with plaintiff for a consultation regarding his weight loss.  Plaintiff's weight was taken and determined to be 192 pounds.  (DSUF (ECF No. 39-2) at ¶ 24; ECF No. 39-8 at 27.)

Plaintiff began chemotherapy on March 30, 2020.  (ECF No. 1 at 5; DSUF (ECF No. 39-2) at ¶ 19.)

On March 30, 2020, plaintiff's primary care physician, Dr. Snook, met with plaintiff following his first injection of chemotherapy and prescribed him Zofran, an anti-nausea medication.  (DSUF (ECF No. 39-2) at ¶ 26.)

**C.  Plaintiff's consultations with defendant during his chemotherapy**

On April 3, 2020, defendant met with plaintiff for a dietary follow up.  Plaintiff weighed in at 195.6 pounds and defendant noted that plaintiff had gained 3.74 pounds in one

week.  Plaintiff told defendant that he had been drinking two Boosts daily, but complained that the food was not enough and asked to have his food portions doubled.  Defendant informed plaintiff that double portions were against policy and noted he had been gaining weight with Boost.  When defendant asked him about his appetite, plaintiff told her that his medication had "shut his system down" and that he did not have an appetite.  Nonetheless, medical records indicated that plaintiff had been eating 100 percent of his meals.  Defendant recommended to plaintiff that he continue with Boost and the Heart Healthy diet.  (DSUF (ECF No. 39-2) at ¶ 27; ECF No. 39-8 at 33.)

Defendant met with plaintiff on April 13, 2020.  Plaintiff told defendant that he was tolerating chemotherapy well and was not experiencing nausea or vomiting.  Plaintiff also informed defendant that he was still drinking Boost each day.  Defendant noted that plaintiff was still consuming 100 percent of his meals and that his weight was 194.3 pounds.  (DSUF (ECF No. 39-2) at ¶ 28; ECF No. 39-8 at 38.)

On April 23, 2020, defendant met with plaintiff, who told her that he was drinking two Boosts a day and not experiencing any nausea or vomiting.  Plaintiff's weight was stable at 194 pounds.  During this visit, plaintiff asked defendant to change Boost Breeze to regular Boost, believing that the regular Boost would help with digestive issues he had been experiencing.  Defendant e-mailed Dr. Snook on April 23, 2020 regarding plaintiff's request to change his LNS from clear Boost to regular Boost.  (DSUF (ECF No. 39-2) at ¶¶ 29, 30; ECF No. 39-8 at 43.)

Defendant conducted a dietary follow up with plaintiff on May 1, 2020.  Plaintiff weighed in at 197.1 pounds, having gained three pounds since the last assessment.  Plaintiff had recently stopped taking Boost, telling Dr. Snook that he did not like it.  Defendant asked plaintiff about stopping Boost, to which he responded that he was "starving" and that Boost did not fill him up.  Defendant informed plaintiff that his weight gain was a sign he was meeting his calorie needs and was therefore well nourished.  Defendant also told plaintiff that LNS was the only option CTC was able to offer him.  (DSUF (ECF No. 39-2) at ¶ 31; ECF No. 39-8 at 48.)

1     Defendant met with plaintiff on May 15, 2020, at which time he weighed in at 192.9

2     pounds.  Defendant did not note signs or symptoms of malnutrition.  Plaintiff's activities of

3     daily living ("ADL") reports showed he was eating 100 percent of meals.  Defendant pointed

4     out to plaintiff that he had gained weight while on Boost and she suggested that he start Boost

5     again to prevent further weight loss.  Plaintiff told defendant that he did not like the taste of

6     Boost and declined to restart it.  Plaintiff also told defendant that he had been feeling nauseous

7     and that he had taste aversions to food.  (DSUF (ECF No. 39-2) at ¶ 32; ECF No. 39-8 at 52.)

8     After the May 15, 2020 consultation, defendant e-mailed Dr. Snook and informed him

9     that plaintiff had lost four pounds in the previous two weeks and refused to start Boost again.

10    (ECF No. 39-7 at ¶ 22.)

11    On May 21, 2020, defendant met with plaintiff, who again told her that he was

12    "starving."  Defendant pointed out to plaintiff that he had gained about 1.76 pounds in the last

13    five days and that his current weight was well within ideal body weight, indicating that he was

14    currently well nourished.  Defendant informed plaintiff that the option for extra nourishment

15    was Boost, not double food portions.  Defendant offered Boost to plaintiff again, but he

16    declined, claiming that it made him vomit.  (DSUF (ECF No. 39-2) at ¶ 33; ECF No. 39-8 at

17    57–58).

18    On May 29, 2020, defendant interviewed plaintiff regarding a healthcare grievance

19    claiming an intolerance to Boost, peanut butter sandwiches, celery, and crackers, and

20    requesting double portions of meals.  During the interview, defendant told plaintiff that the

21    protocol for treating weight loss is to provide LNS and that he continually refused to take

22    Boost.  Defendant suggested that plaintiff increase his anti-nausea medication, Zofran, to help

23    with taste aversions, but plaintiff refused defendant's suggestion.  Defendant informed

24    plaintiff that he had no signs of muscle or fat wasting, his weight trends were steady with no

25    major weight loss or signs of malnutrition, and that double food portions were not an option.

26    Plaintiff did not agree with the outcome of the grievance interview.  (DSUF (ECF No. 39-2) at

27    ¶ 34; ECF No. 39-8 at 61–62.)

28    ////

That same day, following the healthcare grievance interview, defendant met with plaintiff for his weekly dietary follow up.  Defendant again suggested Boost to plaintiff, noting that clear Boost is similar to juice and perhaps would be better tolerated than regular Boost.  Plaintiff declined.  Plaintiff continued to state that he was starving, but defendant pointed out to him that he had no major weight loss since arriving to CTC.  Plaintiff's ADL reports showed he was eating 100 percent of meals.  (DSUF (ECF No. 39-2) at ¶ 35; ECF No. 39-8 at 61–62.)

On June 4, 2020, Defendant met with plaintiff for a dietary follow up.  Plaintiff claimed he was feeling nauseous from chemotherapy that day and had vomited after eating lunch.  He also claimed he still had aversions to peanut butter and was concerned about his weight.  Plaintiff's weight as of June 3, 2020 was 190.3 pounds.  Plaintiff's ADL reports showed that plaintiff was usually consuming 100 percent of his daily meals.  (DSUF (ECF No. 39-2) at ¶ 36; ECF No. 39-8 at 71.)

On June 12, 2020, defendant met with plaintiff, who again told her that he had taste aversions and was vomiting, especially from peanut butter.  Defendant told plaintiff that she did not have the authority to allow for deviation from the authorized menu and suggested that plaintiff submit a healthcare services request form to Food Administrator K. Barnes.  Defendant also spoke to plaintiff about his refusing Zofran for the previous few days.  Plaintiff alleged that it tasted bad when he let it dissolve on his tongue.  Defendant then suggested to plaintiff that he only swallow Zofran and encouraged him to take it in the morning and evening, as it would help with nausea and vomiting.  Defendant again offered two Boost options to plaintiff, and mentioned that the clear Boost, in combination with taking Zofran regularly, might help plaintiff tolerate Boost.  Plaintiff declined and signed a refusal form.  On the day of this dietary follow up, plaintiff weighed 193.4 pounds and his weight loss since admittance to CTC was 2.8 percent of his body weight.  Defendant confirmed with nursing staff that plaintiff's daily meal consumption was normally at 100 percent and that he had not complained of vomiting to nursing staff and that staff had not observed plaintiff vomiting.  (DSUF (ECF No. 39-2) at ¶ 37; ECF No. 39-8 at 75–76.)

On June 23, 2020, defendant met with plaintiff, who had complained about being served pancakes several days in a row, alleging an intolerance to pancakes.  Defendant told plaintiff that CTC was following the approved menu from headquarters and that she was unable to provide substitutions for food items.  Defendant also informed plaintiff that she had several conversations with Food Administrator Barnes and Dr. Snook to confirm that they had exhausted all nutritional interventions.  Defendant again offered plaintiff two choices of Boost, but he declined again and signed a refusal form.  To defendant, plaintiff appeared well nourished with no signs of muscle or fat wasting.  (DSUF (ECF No. 39-2) at ¶ 38; ECF No. 39-8 at 80–81.)

On June 25, 2020, Food Administrator Barnes met with plaintiff in response to a request for interview form he submitted.  Plaintiff told Barnes that he had an increased appetite due to chemotherapy and wanted more food, but could not tolerate pancakes, peanut butter, or LNS, as these food items allegedly made him vomit.  Barnes explained to plaintiff that the Food and Nutrition Services staff at MCSP CTC was following the menu established by headquarters and that they could not modify it to accommodate his preferences.  Barnes confirmed with nursing and custody staff that no one had observed plaintiff vomiting.  (DSUF (ECF No. 39-2) at ¶ 40.)

On July 8, 2020, defendant met with plaintiff for a dietary follow up.  Plaintiff asked how many calories he was receiving, as opposed to how many he needed.  Defendant responded that the Heart Healthy diet provides 2,400 calories per day on average, which was within the range of his estimated need.  Defendant also told plaintiff that when CTC estimates nutritional needs, they take a patient's medical diagnosis into consideration.  Defendant weighed in at 188.5 pounds that morning.  (DSUF (ECF No. 39-2) at ¶ 41; ECF No. 39-8 at 85–86.)

On July 21, 2020, defendant met with plaintiff, who was not undergoing a cycle of chemotherapy at that time.  Plaintiff stated that he was not experiencing any nausea, vomiting, or food aversions.  Defendant recommended that plaintiff try Boost again between rounds of chemotherapy, as he claimed he was not experiencing any food aversions at that time.

Defendant offered him two types of Boost, regular and clear.  Plaintiff declined and signed a refusal form.  According to defendant, plaintiff appeared well nourished and weighed in at 187 pounds that morning.  (DSUF (ECF No. 39-2) at ¶ 42; ECF No. 39-8 at 90.)

Defendant met with plaintiff on July 29, 2020 for a dietary follow up.  Plaintiff told defendant that he had a chemotherapy session the prior day and was experiencing nausea and vomiting.  Defendant suggested to plaintiff that he report his nausea and vomiting to Dr. Snook and request Zofran if needed.  Plaintiff provided defendant an inmate interview request form to discuss replacing milk, pancakes, and peanut butter with other food items.  Defendant again informed plaintiff that CTC does not provide food substitutions and pointed out that this had already been addressed by Food Administrator Barnes.  Plaintiff's ADL reports indicated his daily consumption of meals was at 100 percent and there was no record that plaintiff reported nausea or vomiting to Dr. Snook or nursing staff.  Plaintiff weighed in at 189.2 pounds.  (DSUF (ECF No. 39-2) at ¶ 43; ECF No. 39-8 at 96.)

On August 5, 2020, defendant met with plaintiff for a dietary follow up.  His ADL reports showed that his daily meal consumption was at 100 percent, and weight trends indicated his weight remained steady with no significant changes.  Plaintiff weighed in at 188.76 pounds that morning.  (DSUF (ECF No. 39-2) at ¶ 44; ECF No. 39-8 at 101.)

Between October 5 and October 19, 2020, plaintiff lost fourteen pounds.  Defendant reviewed Dr. Snook's notes and attributed plaintiff's weight loss to edema resulting from his chemotherapy.  She also noted that he had been reported as eating 100 percent of his meals.  (ECF No. 39-7, ¶ 37.)

Plaintiff's lowest recorded weight between March 19 and November 11, 2020 was 185.46 pounds on October 19, 2020.  (ECF No. 39-7, ¶ 37.)

During one of his dietary follow ups in December 2020, plaintiff claimed that he had been collecting nutrition labels from his daily meals.  Based on these labels, he determined he had been receiving 700 calories per day.  Defendant informed plaintiff that CTC kitchen staff follow a menu written by headquarters and that he was receiving an average of 2,400 calories ////

13

1   daily.  Not all of the food inmate-patients receive have a nutrition label with a calorie count

2   affixed to the food item.  (DSUF (ECF No. 39-2) at ¶¶ 46–47.)

3   **III.    Discussion**

4           **A.  Legal Standards – Eighth Amendment**

5           The Eighth Amendment prohibits "cruel and unusual punishments."  Farmer v. Brennan,

6   511 U.S. 825, 832 (1994).  Where a prisoner's Eighth Amendment claims arise in the context of

7   medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to

8   evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106

9   (1976).  An Eighth Amendment medical claim has two elements: "the seriousness of the

10   prisoner's medical need and the nature of the defendant's response to that need."  McGuckin v.

11   Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v.

12   Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

13           **1.   Deliberate Indifference to Medical Needs**

14           A serious medical need exists if the failure to treat the condition could result in further

15   significant injury or the unnecessary and wanton infliction of pain.  Jett v. Penner, 439 F.3d 1091,

16   1096 (9th Cir. 2006).  To act with deliberate indifference, a prison official "must both be aware of

17   facts from which the inference could be drawn that a substantial risk of serious harm exists, and

18   he must also draw the inference."  Farmer, 511 U.S. at 837.  Thus, a defendant is liable if he

19   knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to

20   take reasonable measures to abate it."  Id. at 847.  "It is enough that the official acted or failed to

21   act despite his knowledge of a substantial risk of harm."  Id. at 842.

22           "Indifference 'may appear when prison officials deny, delay or intentionally interfere with

23   medical treatment, or it may be shown by the way in which prison physicians provide medical

24   care.'"  Jett, 439 F.3d at 1096 (quoting Estelle, 429 U.S. at 1059).  To establish a claim of

25   deliberate indifference arising from a delay in providing care, a plaintiff must show that the delay

26   was harmful.  See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at

27   1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Shapley v. Nevada Bd. of

28   State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a] prisoner need not

1   show his harm was substantial; however, such would provide additional support for the inmate's

2   claim that the defendant was deliberately indifferent to his needs." Jett, 439 F.3d at 1096; see

3   also McGuckin, 974 F.2d at 1060.

4          **2.  Denial of Adequate Food**

5       "The sustained deprivation of food can be cruel and unusual punishment when it results in

6   pain without any penological purpose." Foster v. Runnels, 554 F.3d 807, 814 (9th Cir. 2009).

7   However, the Eighth Amendment "only requires the prison to provide food that is adequate to

8   maintain health." Wilson v. Kernan, 369 F. App'x 831, 833 (9th Cir. 2010) (citing LeMaire v.

9   Maass, 12 F.3d 1444, 1456 (9th Cir. 1993)).

10      To succeed on a claim alleging inadequate food, a prisoner "must show his health was in

11   immediate danger or his health suffered as a result of the lack of food." Guillory v. Tilton, No.

12   CV–07–0775 ROS (PC), 2011 WL 4500847, at *6 (E.D. Cal. Sep. 27, 2011) (citing Wishon v.

13   Gammon, 978 F.2d 446, 449 (8th Cir. 1992)).  Allegations of feeling hungry, without more, do

14   not establish an Eighth Amendment violation. See Mendiola-Martinez v. Arpaio, 836 F.3d 1239,

15   1260 (9th Cir. 2016).

16         **B.  Analysis**

17      Plaintiff appears to agree with defendant that the Eighth Amendment's medical

18   indifference standard applies to his claim, but he also cites case law addressing the right to

19   adequate food.  (See ECF No. 44 at 15–16.)  Under either standard, plaintiff's claim fails because

20   no reasonable jury could find that defendant subjectively recognized and ignored a threat to

21   plaintiff's health.

22        **1.  Whether defendant deliberately ignored plaintiff's alleged medical need**

23          **a.  Subjective knowledge**

24      Defendant argues that she did not believe plaintiff faced a substantial risk of serious harm

25   due to inadequate food.  (ECF No. 39-1 at 15.)  According to defendant, plaintiff's "weight

26   remained relatively stable" during the period in question and medical staff reported that he

27   typically consumed 100 percent of his meals.  (Id.)  There was no evidence to corroborate

28   ////

1  plaintiff's claims of vomiting.  (Id. at 19.)  Based on this information, defendant subjectively

2  believed that plaintiff was receiving enough food and meeting his nutritional needs.

3         Plaintiff contends that defendant knew plaintiff was not receiving sufficient food because

4  he told her about his vomiting and food aversions, including his aversion to Boost, and because

5  he repeatedly expressed feeling hungry to her.  (ECF No. 44 at 19.)  Additionally, in 2020,

6  plaintiff gave defendant nutrition labels from some of the food items provided with his meals,

7  which he believed showed that his meal plan did not provide the requisite number of calories.

8  (Id. at 17.)  Based on these communications, plaintiff believes defendant knew that he was not

9  receiving enough food.

10        Plaintiff's argument fails.  The deliberate indifference standard requires a showing that

11  defendant was "aware of facts from which the inference could be drawn that a substantial risk of

12  serious harm exist[ed]" and that she "also dr[ew] the inference."  Farmer, 511 U.S. at 837.  Here,

13  the undisputed evidence shows that defendant did not recognize a substantial risk of serious harm

14  to plaintiff from inadequate nutrition.  Based on her investigations and conversations with

15  medical staff, defendant concluded that plaintiff was not vomiting or having issues finishing his

16  meals and was therefore receiving adequate food.  (ECF No. 39-1 at 15.)  She also noted that his

17  weight had held "steady" during this period.  (ECF No. 39-7, ¶¶ 16, 24, 26, 34.)  Regarding the

18  nutrition labels, defendant advised plaintiff that not all the food items in his meals came with

19  nutrition labels, and plaintiff admits that he did not acquire labels for some food items until after

20  he brought this action and served defendant with discovery requests.  (DSUF (ECF No. 39-2) at

21  ¶¶ 46–47; ECF No. 44 at 33.)  Defendant therefore could not have known in 2020 that plaintiff

22  was receiving inadequate food, based on the nutrition labels he gave her.

23        For these reasons, no reasonable jury could find that defendant recognized a threat to

24  plaintiff's health from inadequate nutrition.

25                 **b.  Defendant's response to plaintiff's alleged medical need**

26        Defendant lists several actions she took to address plaintiff's claims that he was not

27  receiving sufficient food, demonstrating she did not deliberately ignore his concerns.  For

28  example, she communicated with plaintiff's primary care physician, Dr. Snook, when plaintiff

1    lost weight in May 2020, and again in June 2020 when plaintiff requested double portions.  (ECF

2    No. 39-1 at 19.)  She also regularly coordinated with medical staff to determine if plaintiff was

3    vomiting and how much of his meals he was consuming.  (Id. at 19–20.)

4           Plaintiff interprets the applicable MCSP policy as requiring defendant to provide him

5    extra food if he could not tolerate the prescribed LNS.  (ECF No. 44 at 26, 27.)  He also accuses

6    defendant of coercing Dr. Snook and Food Administrator Barnes into denying his request for

7    double portions, out of a dislike for plaintiff.  (Id. at 26, 29–30, 40.)  However, he has not offered

8    any evidence to corroborate this accusation or refute defendant's account of her actions.

9           Where, as here, a prisoner's medical indifference claim is based on a disagreement over

10   the proper course of treatment, the prisoner "must show that the chosen course of treatment 'was

11   medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an

12   excessive risk to [the prisoner's] health.'"  Toguchi, 391 F.3d at 1058 (alteration in original).

13   Defendant did not consciously disregard plaintiff's complaints.  For instance, on May 19, 2020,

14   defendant investigated whether plaintiff could receive double portions after plaintiff filed a

15   healthcare grievance requesting more food.  (ECF No. 39-7, ¶ 24.)  On multiple occasions, when

16   plaintiff told her that he was nauseous and unable to tolerate many of the food items provided

17   through his meal plan, she consulted with nursing staff to confirm whether he was vomiting and

18   therefore not getting the nutrition he needed.  (Id., ¶¶ 25, 27, 29, 30, 37.)  When he told her he

19   could not tolerate peanut butter, she contacted the kitchen staff to ascertain how many of his

20   meals contained peanut butter and in what proportions, in order to determine its potential impact

21   on his "nutritional status."  (Id., ¶ 28.)  Throughout this time, defendant continued to offer

22   plaintiff Boost to meet his nutritional needs and recommended he take his Zofran more regularly

23   to combat nausea and food aversions.  (DSUF (ECF No. 39-2) at ¶¶ 32, 33, 34, 35, 37, 38, 42,

24   43.)  Each time, plaintiff refused.  (Id.)

25          Plaintiff does not state how these actions were medically unacceptable or what actions he

26   believes defendant should have taken, other than grant his request for double portions.  (See

27   generally ECF No. 44.)  Defendant could not recommend increased portions or substitutions.  The

28   applicable MCSP policy recognizes a narrow set of instances in which a prisoner's adverse

17

1   reaction to specific food items constitutes a food intolerance, none which includes aversions

2   caused by chemotherapy.  (ECF No. 39-4 at 5–6.)  Even if medical staff agreed that plaintiff

3   could not tolerate the LNS, peanut butter, and pancakes, the policy does not permit prison

4   officials to substitute the food items in question.  (Id. at 6.)  Specifically, it states: "If a patient is

5   allergic or intolerant to a readily identified food(s) . . . he/she will be educated to avoid the

6   offending food, but no food substitution will be given."  (Id.)  As a result, defendant lacked the

7   power to give plaintiff more food or substitute items.

8       In July 2021, plaintiff was transferred to the CTC at the Richard J. Donovan Correctional

9   Facility (RJD).  (ECF No. 44 at 49.)  His dietician at that facility "ordered [plaintiff a] regular

10  diet" with double portions, eliminated peanut butter from plaintiff's meals, and substituted milk

11  with juice.  (Id.)  Plaintiff provides documentation verifying this claim.  (ECF No. 44-1 at 217.)

12  According to plaintiff, the RJD dietician's actions prove that defendant could recommend double

13  portions and deliberately ignored his nutritional needs when she did not.  (ECF No. 44 at 49.)

14      However, the policy that barred defendant from offering plaintiff additional portions

15  appears to have been specific to MCSP, and it is not clear whether the RJD dietician was subject

16  to an identical or similar policy at RJD.  (See ECF No. 39-4 at 2; DSUF (ECF No. 39-2) at ¶¶ 7–

17  9.)  Consequently, the RJD dietician's recommendations do not indicate that defendant's course

18  of action was medically unacceptable, especially in light of evidence showing that plaintiff's

19  weight had stabilized, that he was finishing his meals, and that he was not vomiting.

20      For these reasons, no reasonable jury could find that defendant deliberately ignored

21  plaintiff's serious medical needs.

22          **2.  Denial of Adequate Food**

23      Plaintiff's denial of adequate food claim also fails because he cannot show that he

24  received inadequate food.  Plaintiff cites feelings of hunger, vomiting and food intolerance,

25  significant weight loss, and calorie calculations based on nutrition labels as evidence that he did

26  not receive enough food.  However, plaintiff's sense of hunger, weight loss, and calculations do

27  not prove that he received insufficient food, and any loss of calories due to nausea cannot be

28  traced to defendant's alleged inaction.

First, it is not clear that plaintiff's hunger pains were the result of insufficient food. During plaintiff's first consultation with defendant on March 19, 2020, eleven days before he began chemotherapy, plaintiff told defendant that he had been eating all his food but felt like he was "starving."  (ECF No. 39-4 at 20.)  In a grievance filed on May 17, 2020, he told prison officials that one of his medications, dexamethasone, increased his appetite, and he told Food Administrator Barnes that "he had an increased appetite due to chemotherapy."  (ECF No. 44-1 at 49; DSUF (ECF No. 39-2) at ¶ 40.)  His complaint also attributes his increased appetite to dexamethasone.  (ECF No. 1 at 5.)  It is therefore not established that plaintiff felt hungry due to inadequate food, as opposed to other causes like medication.

Second, plaintiff emphasizes throughout his filings that the myeloma caused him to lose thirty-nine pounds between October 2018 and the start of his chemotherapy on March 30, 2020. (ECF No. 1 at 5; ECF No. 44 at 7.)  However, this issue predates his consultations with defendant and does not speak to whether he received inadequate food while under her care between March 19 and November 11, 2020.  His medical records show that his weight loss slowed during this period.  According these records, he was 192 pounds on March 26, 2020, four days before he began chemotherapy, and his lowest weight during treatment was 185 pounds.  (ECF No. 39-4 at 21; ECF No. 39-8 at 119.)  Although he did experience some periods of extreme weight loss, including fourteen pounds in two weeks in October 2020, plaintiff has not linked this weight loss to defendant's alleged inaction.  (ECF No. 39-7, ¶ 37.)  Defendant attributed this fluctuation to edema caused by chemotherapy, and plaintiff repeatedly rejected her advice for maintaining his weight.  (Id.; DSUF (ECF No. 39-2) at ¶¶ 34, 37, 43, 54.)

Third, plaintiff's calorie calculations do not appear to account for ingredients for which he does not have nutrition labels, such as condiments or sauces, or for the possibility that he received more than the indicated serving size of a particular item.  They therefore do not establish that his meal plan did not meet his nutritional needs.

Finally, plaintiff's medical records capture his complaints about vomiting and food aversions, but also show that he was finishing most of his meals and that medical staff did not encounter evidence of vomiting.  To the extent he experienced these symptoms, he rejected

1    defendant's suggestion that he take his anti-nausea medication regularly; he did not tell Dr. Snook

2    that the anti-nausea medication was making him ill or request an alternative anti-nausea

3    prescription; and defendant could not increase his portions to counteract any calorie loss due to

4    nausea.  (DSUF (ECF No. 39-2) at ¶¶ 34, 37, 43, 54; ECF No. 39-4 at 5–6.)  Thus, any calorie

5    deficiencies plaintiff experienced from nausea are not attributable to defendant's alleged inaction.

6    See Spokeo v. Robins, 578 U.S. 330, 338 (2016) ("The plaintiff must have (1) suffered an injury

7    in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely

8    to be redressed by a favorable judicial decision.").

9           For these reasons, plaintiff cannot succeed on his inadequate food claim and defendant is

10    entitled to summary judgment.

11                          **3.  Qualified Immunity**

12          Defendant also asserts qualified immunity.  She argues that no reasonable prison official

13    in her position would have known her actions violated plaintiff's constitutional rights, because

14    she took appropriate action in response to plaintiff's complaints, had no evidence that plaintiff

15    was receiving inadequate food, and complied with applicable MCSP policy.  (ECF No. 39-1 at

16    26–27.)  Because defendant is entitled to summary judgment on the merits of plaintiff's claim,

17    the court need not decide whether she is also entitled to qualified immunity.  See O'Brien v.

18    Welty, 818 F.3d 920, 936 (9th Cir. 2016); Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d

19    365, 371 n.4 (9th Cir. 1998).

20    ////

21    ////

22    ////

23    ////

24    ////

25    ////

26    ////

27    ////

28    ////

CRITICAL

**CONCLUSION**

For the reasons set forth above, IT IS RECOMMENDED that:

1.  Defendant's motion for summary judgment (ECF No. 39) be granted; and

2.  The Clerk of the Court be directed to close this case.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty days after being served with these findings and recommendations, either party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  September 1, 2023

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DB:15
DB/DB Prisoner Inbox/Civil Rights/S/crav2327.msj.fr